IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JUANONA N. , | ) |
| | ) |
| Plaintiff, | ) |
| | ) No.  19 C 4110 |
| v. | ) |
| | ) Magistrate Judge Jeffrey Cummings |
| ANDREW SAUL, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Claimant Juanona N. ("Claimant")[1] brings a motion for summary judgment to reverse the final decision of the Commissioner of Social Security ("Commissioner") that denied her application for supplemental security income and disability insurance benefits ("DIBs") under the Social Security Act.  42 U.S.C. §§416(i), 402(e), and 423.  The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. §636(c).  Claimant has filed a motion for summary judgment, and the Commissioner has filed a cross-motion.  This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§405(g) and 1383(c)(3).  For the reasons stated below, Claimant's motion for summary judgment (Dckt. #15) is granted, and the Commissioner's motion (Dckt. #19) is denied.

**I. BACKGROUND**

  **A.**  **Procedural History**

On August 17, 2015, Claimant filed a disability application alleging a disability onset date of February 2, 2009.  Her claim was denied initially and upon reconsideration.  On August

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an opinion.  Therefore, only the claimant's first name shall be listed in the caption. Thereafter, we shall refer to Juanona N. as Claimant.

1

13, 2018, an Administrative Law Judge ("ALJ") issued a written decision denying benefits to Claimant. The Appeals Council denied review on April 15, 2019, making the ALJ's decision the Commissioner's final decision. 20 C.F.R. §404.985(d); *see also Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001). Claimant subsequently filed this action in the District Court on June 19, 2019.

### B. The Social Security Administration Standard To Recover Benefits

In order to qualify for disability benefits, a claimant must demonstrate that she is disabled. An individual does so by showing that she cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. §404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. 20 C.F.R. §404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. §404.1520(a)(4)(i). It then determines at step two whether the claimant's physical or mental impairment is severe and meets the twelve-month duration requirement noted above. 20 C.F.R. §404.1520(a)(4)(ii). At step three, the SSA compares the impairment or combination of impairments found at step two to a list of impairments identified in the regulations ("the listings"). The specific criteria that must be met to satisfy a listing are described in Appendix 1 of the regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a listing, the individual is considered to be disabled, and the analysis concludes. If the listing is not met, the analysis proceeds to step four. 20 C.F.R. §404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines her exertional and non-exertional capacity to work. The SSA then determines at step four whether the claimant is able to engage in any of her past relevant work. 20 C.F.R. §404.1520(a)(4)(iv). If the claimant can do so, she is not disabled. *Id*. If the claimant cannot undertake her past work, the SSA proceeds to step five to determine whether a substantial number of jobs exist that the claimant can perform in light of her RFC, age, education, and work experience. An individual is not disabled if she can do work that is available under this standard. 20 C.F.R. §404.1520(a)(4)(v).

### C. Claimant's Arguments For Remand

Claimant urges this Court to reverse and remand the ALJ's decision to deny her an award of benefits based on her argument that the ALJ's evaluation of her credibility was erroneous because it was based on a factually and logically flawed analysis that improperly discounted her subjective symptom allegations. Because the ALJ's decision is grounded in this flawed analysis, according to Claimant, the decision is not supported by substantial evidence.

### D. The Evidence Presented to the ALJ

The administrative record contains the following relevant evidence that bears on Claimant's claim:

#### 1. Evidence From Claimant's Treatment History

Claimant was involved in a vehicular accident in 2009 that she claims began a disability period based largely on back pain. She also claims that she experiences headaches triggered in large part by sensitivity to light, as well as asthma and numbness in her hands. As the ALJ noted, the record contains only limited information on all of these issues, particularly for the early years of the disability period. (R. 107). Claimant reported at a physical exam on October

17, 2012 that she had no back, neck, joint, or muscle pain. (R. 463). She did seek treatment in March 2014 for lower back pain that radiated down her right leg, but the treatment note indicated that her condition was "well controlled" by ibuprofen and methocarbamol. (R. 412-14). A November 2014 note states that ibuprofen alleviated Claimant's back pain and that pain did not prevent her from working. (R. 448). The next entry dated July 29, 2015, however, suggested increased concerns. Claimant stated that her pain was moderate and could be relieved with ibuprofen and a muscle relaxant; however, she added (somewhat cryptically) that she was now experiencing pain 20 times a month "and will [b]e incapacitated." (R. 454).

      In February 2016, Claimant had an x-ray of the lumbar spine that showed only partially calcified densities in the left hemipelvis that the radiologist thought were probably partially calcified uterine fibroids. (R. 524). Claimant's leg pain increased significantly by April 30, 2016, when she complained that her pain was constant and was worse with walking. (R. 661). On May 21, 2016, she had moderate pain in the thoracic spine with a limited range of motion. (R. 421). An August 2016 x-ray showed minimal problems, however, with no acute fracture, dislocation, or bony erosion. (R. 748).

      In February 2017, physical therapy was recommended for Claimant's back pain, but she declined to begin it because she believed that it was "unpredictable when she is able to leave the house." (R. 561). She complained of diffuse lower back pain, however, and sought treatment in March at a pain clinic. Claimant complained of constant back pain at the 10/10 level. She stated that standing and walking exacerbated her condition but that her medication helped. (R. 784). An MRI of the lumbar spine in April 2017 again demonstrated minimal findings. There was partial disc desiccation in the lower thoracic and upper lumbar spine but no herniation or stenosis in the lower lumbar spine. (R. 774). Claimant was diagnosed with multi-level facet arthropathy,

shoulder strain, and chronic low back pain, and it was noted that her pain was not well controlled by gabapentin and ibuprofen. (R. 21-22). She was later referred to a neurosurgery clinic in August 2017, where she complained of radiating back pain, difficulty holding things with her hands, and light sensitivity. No neurological problems were identified, however, and Claimant was told to continue with pain medication and to pursue physical therapy. (R. 754). In January 2018, Claimant fell down a flight of stairs that led to a CT scan of the lumbar spine. Mild diffuse disc bulges were observed throughout most of the lumbar spine vertebrae that caused mild vertebral canal stenosis and mild bilateral neural foraminal stenosis. (R. 709).

The record reflects little information concerning Claimant's vision problems. An August 2015 exam stated she was experiencing light sensitivity in both of her eyes but no diagnosis was reached. (R. 417). She stated much the same at the neurosurgery clinic in August 2017. (R. 752). In December 2017, Claimant again complained of light sensitivity and wore sunglasses during her exam. (R. 13). She told her doctor that she had seen an ophthalmologist but could not recall what her diagnosis was. (R. 13).

### 2.     Evidence From the State-Agency Experts

On March 9, 2016, non-examining expert Dr. Calixto Aquino issued a report to the SSA on Claimant's condition. Dr. Aquino found that Claimant's alleged impairments of asthma, a spine disorder, and the loss of her central visual acuity were all non-severe. Claimant had only mild lung defects and a minimal decrease in her diffusing capacity. She had normal strength in all of her limbs with only mild restrictions in the lumbar spine. Dr. Aquino stated that she could work with small and large objects despite her alleged visual impairment and that no RFC assessment was required. (R. 67-69). Dr. Richard Bilinsky agreed with these findings at the reconsideration stage on August 16, 2016. (R. 82).

On February 1, 2016, Dr. Roopa Karri examined Claimant at the SSA's request and issued a report. Claimant described a variety of ailments that included shortness of breath when climbing stairs, heart palpitations, headaches, and back pain that radiated down into her legs. Dr. Karri noted that Claimant appeared at the examination wearing sunglasses as well as a mask "to prevent getting sick." (R. 518). Dr. Karri stated that Claimant was sensitive to light and that the funduscopic exam – the visual exam of the retina frequently used in physical evaluations – was "poorly visualized" but showed no obvious problems. Claimant was able to walk 50 feet without support, had 5/5 strength in her upper and lower limbs, and 4/5 grip strength bilaterally. She had normal range of motion in all areas except the lumbar spine, which showed 80 degrees of flexion and 20 degrees of extension. An accompanying x-ray showed partially-calcified densities in the left hemipelvis and trace anterolisthesis at L5-S1. Dr. Karri diagnosed a history of low back pain with a mildly decreased range of motion, controlled asthma, a history of anxiety, palpitations, and headaches with photosensitivity. (R. 518-20).

### 3. Evidence From the Administrative Hearing

Claimant appeared unrepresented by counsel for an administrative hearing on January 19, 2018. She told the ALJ that her back hurt "absolutely constantly" but that medication allowed her to move notwithstanding the pain. (R. 36). Claimant described her pain as 10/10 without medication and 7-8/10 with it. (R. 37). The ALJ did not ask Claimant to describe her daily activities or any of her exertional abilities, but Claimant stated on her own that she could not carry a half-gallon of milk. (R. 51).

Claimant also told the ALJ that she experienced headaches and dizziness. She becomes dizzy three to four times a day and must sit down "and get my stuff together." (R. 39). She also experiences headaches twice daily for 20 minutes each. Claimant stated that she was very

6

sensitive to light and that she had to go into a dark room when the headaches began. (R. 40-41). She stated that she could not manage office lighting, and she wore sunglasses during the administrative hearing. (R. 43).

## II. THE ADMINISTRATIVE LAW JUDGE'S DECISION

On August 13, 2018, the ALJ issued a decision finding that Claimant was not disabled. Applying the five-step sequential analysis that is used to evaluate disability claims, the ALJ found at Step 1 that Claimant had not engaged in substantial gainful activity since her alleged onset date of February 2, 2009. She had the severe impairment at Step 2 of degenerative disc disease and the non-severe impairments of asthma and the loss of her central vision. The ALJ determined at Step 3 that these impairments did not meet or medically equal a listing either singly or in combination.

Before moving to Step 4, the ALJ found that the objective medical record did not fully support Claimant's descriptions of the severity or frequency of her symptoms. She also assigned "good" weight to the state-agency experts' findings that Claimant did not have any severe impairments and did not require an RFC assessment. Despite that, the ALJ concluded that evidence submitted after the hearing showed that Claimant's degenerative disc disease was severe and formulated an RFC of medium work as that term is defined in 20 C.F.R. §404.1567(c). That meant that Claimant could lift or carry 50 pounds occasionally and 25 pounds frequently. She could walk and/or stand six hours a day and also sit six hours. However, she could never climb ladders, ropes, or scaffolds. Based on the testimony of a vocational expert ("VE"), the ALJ determined at Step 4 that Claimant could carry out her past relevant work as a bus driver. Although that meant that Claimant was not disabled, the ALJ continued, in the alternative, to Step 5. The VE stated that jobs were available in the national economy for a

7

person with Claimant's RFC. Accordingly, the ALJ found that Claimant was not disabled based on both the Step 4 and Step 5 analyses.

### III. STANDARD OF REVIEW

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. §405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). "Substantial evidence is not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Karr v. Saul,* 989 F.3d 508, 511 (7th Cir. 2021), *quoting Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal quotation marks omitted). The Commissioner's decision must also be based on the proper legal criteria and be free from legal error. *Scheck v. Barnhart,* 357 F.3d 697, 699 (7th Cir. 2004); *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts, resolving conflicts, deciding credibility questions, by making independent symptom evaluations, or by otherwise substituting its judgment for that of the Commissioner. *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant

is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

## IV. ANALYSIS

Claimant argues that the ALJ erred because she failed to properly evaluate Claimant's description of the frequency and severity of her symptoms. The Court agrees that the ALJ failed to build a logical bridge between the record and her findings on this issue. Since remand is necessary, however, the ALJ will also be required to restate her reasons for the RFC. Claimant does not challenge the ALJ's finding on that issue, but the Court's own review shows that the ALJ failed to explain her reasons for finding that Claimant could carry out medium work. *See Mangan v. Colvin*, No. 12 C 7203, 2014 WL 4267496, at *1 (N.D.Ill. Aug. 28, 2014) (stating that courts can *sua sponte* address issues in social security cases) (citing cases); *see also JSB-1 v. Saul*, No. 3:18-cv-266, 2019 WL 2482714, at *2 n.2 (N.D.Ind. June 14, 2019) (same).

### A. The ALJ Must Restate Her Reasons for the Symptom Evaluation

Once an ALJ determines that a claimant has a medically determinable impairment, the ALJ must evaluate the intensity and persistence of the symptoms that can reasonably be expected to stem from it. A court may overturn a symptom evaluation if the ALJ fails to justify his or her conclusions with specific reasons that are supported by the record. *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017). An ALJ's analysis should consider the claimant's daily activities; the frequency and intensity of her symptoms; the dosage and side effects of medications; non-medication treatment; factors that aggravate the condition; and functional restrictions that result from or are used to treat the claimant's symptoms. 20 C.F.R. §404.1529(c); SSR 16-3p. When considering a claimant's symptoms, the ALJ must build a logical bridge between the symptom evaluation and the record. *See Cullinan*, 878 F.3d at 603; *Villano v. Astrue*, 556 F.3d 558, 562-

63 (7th Cir. 2009) (requiring an analysis of the SSR 16-3p factors as part of a logical bridge for the symptom evaluation). The ALJ in this case reviewed the medical record, cited some of Claimant's daily activities, and noted that she had received conservative treatment that the ALJ thought was inconsistent with a disabling condition. (R. 109). These issues track some of the factors set out in the regulations, but the ALJ failed to explain how any of them were inconsistent with the symptoms that Claimant described.

The problem begins with the administrative hearing, where Claimant appeared without an attorney. An ALJ always has a duty to develop a full and fair record, but that obligation is enhanced when a claimant is unrepresented. *See Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009). The ALJ met this obligation to some degree by requesting medical records that Claimant had not submitted by the time of the hearing. Ordering records, however, is not all that an ALJ is required to do in this circumstance. When a claimant is unrepresented, "the ALJ has a duty to scrupulously and conscientiously probe into, inquire of, and explore for *all* relevant facts." *Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997) (internal quotes and citation omitted) (emphasis added). That includes a duty to ask the questions that are necessary to explore the claimant's symptoms, exertional abilities, and treatment history. *See, e.g., Thompson v. Sullivan*, 987 F.2d 1482, 1492 (10th Cir. 1993) (stating that an ALJ is required to ask "enough questions or the right questions at the hearing . . . to support his determination of her credibility"); *Rosado v. Barnhart*, 290 F.Supp.2d 431, 438 (S.D.N.Y. 2003) ("The ALJ is thus obligated to explore the facts by obtaining relevant medical records and asking questions . . . to assist the claimant in developing her case.") (internal quotes and citation omitted).

Contrary to this requirement, the ALJ never asked Claimant anything about her ability to walk, sit, stand, lift, or carry – *i.e.*, those activities that were central to assessing her alleged

10

symptoms and formulating an RFC. Indeed, she made no inquiry into Claimant's activities of daily living ("ADLs") at all other than a brief question on her ability to shop. (R. 47). Claimant tried to describe some of those activities on her own, but the ALJ's only attempt to inquire into these fundamental aspects of a symptom evaluation was the following aside to Claimant during the ALJ's discussion with the VE: "When you filled out your function report, you said that you were able to get yourself dressed, and bathe, and cook for yourself. And, I assume that's still true[?]" (R. 47). The mere fact that Claimant could bathe, dress, and cook, however, did not shed light on her disability claim because "[t]here is no requirement in social security law that a person be unable to feed, groom, bath[e] or dress herself in order to be disabled." *Wates v. Barnhart*, 274 F.Supp.2d 1024, 1039 (E.D.Wis. 2003).

The more relevant inquiry was what Claimant's daily activities involved and the effort that it took for her to carry them out. The ALJ may have thought that she did not need to ask Claimant about these issues because, like most disability applicants, Claimant had already described many of her activities and exertional limitations in the written function report that the ALJ referred to in the exchange just cited. She had also submitted a Pain Questionnaire that repeated some of this information. The ALJ drew on these descriptions to state that Claimant's ability to perform daily activities contradicted the symptoms that she identified. Specifically, the ALJ noted that she could watch TV, prepare meals, shop, spend time with others, walk, drive, read, and use public transportation. (R. 107).

This list of activities fails to support the ALJ's conclusion because she overlooked most of what Claimant stated about each of them. Claimant explained, for example, that other than preparing meals, she watched TV all day until it was time to go to bed. (R. 274). The Court is unable to discern why the ALJ thought that watching TV for long periods was inconsistent with

11

Claimant's testimony that she was in pain "absolutely constantly" or that she experienced dizziness and headaches every day. (R. 36). The same is true with meal preparation, which Claimant said only involved heating frozen food, soup, making a salad, or some other activity that would take "a few minutes." (R. 275). As for walking, Claimant stated that she could only walk one block and then had to rest two to three minutes – activities that were fully consistent with her symptom testimony. (R. 277). Claimant has a driver's license (but does not have a car), and her ability to take public transportation fails to support the ALJ's reasoning because Claimant stated that she can only leave her home twice a week. (R. 280). The ALJ did ask Claimant at the hearing if she could go shopping, but Claimant told her that was possible only if someone took her to the store. (R. 47). She also asked Claimant if she could read "something," (R. 43), but never asked what she read or how long she could do so. Contrary to the ALJ's reasoning, therefore, all of the activities that she cited were largely consistent with Claimant's statements that her ability to walk, cook, or function was significantly limited by pain.

     Moreover, the ALJ made no attempt to draw any link between Claimant's account of her symptoms and the record itself. SSR 16-3p instructs ALJs that "objective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms[.]" 2017 WL 51800304, at *5. The ALJ *reviewed* the record in some detail, but she never moved beyond that summary to "explain perceived inconsistencies between a claimant's activities and the medical evidence." *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). The record was a potential support for the ALJ's conclusions on the symptom issue because – although Claimant at times alleged severe pain – medical tests and the medications given to her do not always confirm what she claimed. Nevertheless, an ALJ must do more than just restate medical findings in a symptom evaluation; she must also "competently explain an adverse-

credibility finding with specific reasons supported by the record." *Engstrand v. Colvin*, 788 F.3d 655, 660 (7th Cir. 2015) (internal quotes and citation omitted).

The ALJ provided two additional reasons for discounting Claimant's symptom testimony. First, she noted that Claimant had worked as a caregiver after her alleged onset date and pointed out that she had left her job only because her client obtained another helper. (R. 107). As with Claimant's ADLs, however, the ALJ failed to account for what she said about this work. Claimant stated in her written function report that she only worked as a caregiver on a part-time basis for five hours a day, two days a week – *i.e.*, 10 hours a week. (R. 287). The ALJ should have been aware that working part-time is not in itself always incompatible with a claim of disability. *See Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013) ("The fact that [a claimant] pushed herself to work part-time and maintain some minimal level of financial stability, despite her [impairment], does not preclude her from establishing that she was disabled."). Work performed during an alleged disability period can be relevant if the record shows the exertional effort that it required. *See Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). In this case, the function report states that Claimant did not walk, climb, lift, or carry anything as a caregiver. (R. 287). That represents far less than the medium level of work that the ALJ said Claimant could do. The ALJ was therefore obligated to explain with greater care why she relied on Claimant's prior work.

The ALJ next reasoned that Claimant exaggerated her symptoms based on the ALJ's observation of her at the hearing. The ALJ pointed out that Claimant walked into the hearing room without assistance. That did not contradict any of Claimant's statements because she said that she could walk one block – more than the few feet required to move from one room to another. The ALJ also stated that Claimant sat throughout the hearing "without any overt pain

13

signs, such as grimacing or vocalizations." (R. 107). This referenced the "sit and squirm" test whose usefulness has been questioned by many courts. *See*, *e.g.*, *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) ("Many courts have condemned the 'sit and squirm' test, and we are uncomfortable with it as well.") (citing cases). *Powers* noted that an ALJ's observation of a claimant's demeanor and physical expressions can play an important role in assessing symptoms, *id.*, but an ALJ "may not discredit a claimant's testimony simply because the claimant failed to 'sit and squirm.'" *Flores v. Massanari*, 19 Fed.Appx. 393, 404 (7th Cir. 2001) (citation omitted). Moreover, the ALJ's use of the test in this case was clearly irrelevant because Claimant stated in a written report that she could sit for two hours at a time, and the administrative hearing only lasted 35 minutes. (R. 25, 35, 319). The ALJ therefore had no reason to expect that Claimant would cry out in pain during her testimony.

      The ALJ noted that Claimant received conservative care for her condition, and this can be evidence that an applicant's condition is not as serious as she claims. *See Geer v. Berryhill*, 276 F.Supp.3d 876, 887 (E.D.Wis. 2017). Nevertheless, an ALJ cannot rely on the conservative nature of care to discount a claimant's testimony when the treatments he or she received did not work. *Pickup v. Colvin*, 606 Fed.Appx. 430, 433 (10th Cir. 2015). The record shows that Claimant not only continued to complain of pain after receiving conservative care, the ALJ herself found that Claimant's condition had worsened based on evidence that post-dated those parts of the record that the state-agency doctors reviewed. That suggests that Claimant's degenerative condition was progressive over time, and an ALJ is required to consider the progressive nature of an impairment in disability analyses. *See Scrogham v. Colvin*, 765 F.3d 685, 697 (7th Cir. 2014); *see also Morgan v. Holland*, No. 5:05CV43, 2006 WL 8442172, at *5

(N.D.W.Va. Sept. 27, 2006) ("Degenerative disc disease is a progressive condition that is related to the normal aging process.").

In addition, "[a]n ALJ errs in relying on conservative treatment if the record does not reflect that more aggressive treatment options are appropriate or available." *Corless v. Comm. of Soc. Sec. Admin.*, 260 F.Supp.3d 1172, 1176 (D.Ariz. 2017) (internal quotes and citation omitted); *see also McDowell v. Astrue*, No. 1:12-CV-03519, 2013 WL 3337795, at *10 (N.D.Ill. July 2, 2013). Contrary to that, the ALJ pointed out that more aggressive treatment options had *not* been offered to Claimant other than an epidural injection. (R. 109). The ALJ appears to have thought that Claimant's refusal to have this injection undermined her testimony because the ALJ raised the issue twice in her decision. She did not raise it at the hearing, however, and an ALJ may not discount a claimant's testimony for the lack of treatment without first giving the applicant an opportunity to explain her reasons. *See* SSR 16-3p, 2017 WL 5180304, at *9; *see also Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012). It was incumbent upon the ALJ to do so because the record suggests that Claimant had a degree of anxiety about some forms of treatment. In January 2017, for example, she refused to enter the hospital for a surgery evaluation after a CT scan showed the possibility of serious issues that her doctor warned could lead to a "heart attack, stop[ped] breathing, and death." (R. 671). Claimant also declined to enter physical therapy in 2017 because she believed that it was "unpredictable when she is able to leave the house." (R. 561). Whether these hesitations were reasonable or not, they indicate that Claimant at least believed that she had good reasons for her treatment choices that went beyond the lack of severity that the ALJ assumed was the case.

Finally, it is unclear how the ALJ went about assessing Claimant's description of her pain. The ALJ noted some of Claimant's pain testimony and cited the medical record at length.

15

That was a necessary aspect of addressing this issue, an an ALJ "may disregard a claimant's assertions of pain if he validly finds her incredible." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006). In this case, however, the ALJ did not move beyond her evidentiary summary to draw any link between the record and Claimant's allegations. She appears to have believed that the objective record could speak for itself on the pain issue. That is incorrect because an ALJ may "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual." SSR 16-3p, 2017 WL 5180304, at *5. The Seventh Circuit has been very clear that pain can be disabling "even when its existence is unsupported by objective evidence." *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004); *see also Pierce v. Colvin*, 739 F.3d 1046, 1049-50 (7th Cir. 2014) ("Pain can be severe to the point of being disabling even though no physical cause can be identified[.]"). Contrary to these guidelines, the ALJ never addressed the subjective nature of Claimant's pain and made no attempt to consider that her pain may have been more serious than the record states. Remand is therefore necessary so that the ALJ can draw a logical bridge between the record and her symptom evaluation.

      B.    **The ALJ Must Restate the Reasons for the RFC Assessment**

The RFC addresses the maximum work-related activities that a claimant can perform despite the limitations that stem from his or her impairments. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). "In determining what a claimant can do despite [her] limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do." *Id*. Such evidence includes the claimant's medical history; the effects of treatments that she has undergone; the

16

reports of activities of daily living ("ADL"); medical source statements; and the effects of the claimant's symptoms. SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996). The RFC must accommodate all of a claimant's limitations that are supported by the record. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015). In addition, an ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184, at *7.

The ALJ in this case had no expert RFC opinion to rely on because the state-agency doctors did not issue an RFC, and Claimant did not submit a treating doctor's opinion. That did not prevent the ALJ from correctly assessing the RFC because it constitutes a legal instead of a medical decision. *See Newell v. Astrue*, 869 F.Supp.2d 875, 890-91 (N.D.Ill. 2012). That said, an ALJ must still explain the basis of her reasoning and provide evidentiary support for it. Even if the record arguably supports the RFC, therefore, remand is still required when an ALJ fails to carry out that obligation. *See Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005) ("Contrary to SSR 96-8p, however, the ALJ did not explain how he arrived at these [RFC] conclusions; this omission in itself is sufficient to warrant reversal of the ALJ's decision.").

The ALJ violated these principles by providing no explanation of how she reached the RFC finding. She said that Claimant's ability to walk into the hearing room unassisted and to sit through the hearing without grimacing did "not support limitations beyond the above-defined [RFC]." (R. 107). The fact that a person can walk a few feet without a cane and can sit for 35 minutes, however, is only evidence that she can perform *those* activities; it says nothing about her ability to walk or sit for six hours a day and is irrelevant to the ability to lift and carry items throughout the workday. The ALJ also cited records showing that Claimant had a normal range

17

of motion (at least at times) in her joints and back and that she had normal strength. (R. 108). There is no self-evident link, however, between those findings and a conclusion that Claimant – a 50-year old woman with degenerative disc disease who was 5 feet and 3 inches tall – could occasionally lift 50 pounds as opposed, say, to 40 or 30 pounds. (R. 571).

The ALJ did not tie Claimant's alleged capacity to perform medium work to any part of the record or even discuss the topic in her decision. She restated the record in some detail, but "[m]erely summarizing the record . . . is not in itself a substitute for an ALJ's duty to explain the basis of" the RFC. *Elmalech v. Berryhill*, No. 17 C 8606, 2018 WL 4616289, at *10 (N.D.Ill. Sept. 26, 2018). Instead of citing evidence, the ALJ appears to have split the difference between Claimant's statement that she could barely lift a half-gallon of milk and the state-agency doctors' finding that no RFC was necessary. That was erroneous because "ALJs are not permitted to construct a 'middle ground' RFC without a proper medical basis," *Norris v. Astrue*, 776 F.Supp.2d 616, 637 (N.D.Ill. 2011), and the ALJ must explain in at least minimal form what it was that led her to find that Claimant could carry out the RFC by complying with the standards of SSR 96-8p. *See Wilder v. Chater*, 64 F.3d 335, 338 (7th Cir. 1995) (stating that a claimant "is entitled to a decision based on the record rather than on a hunch").

As part of that explanation, the ALJ must also account for all the issues that Claimant described at the hearing. She told the ALJ that she became dizzy on a daily basis. The ALJ included a restriction in the RFC that prevented Claimant from having to climb ladders, ropes, or scaffolds. That was presumably because of the dizziness issue, though the ALJ did not explain her reasoning. However, the RFC did not keep Claimant from climbing stairs even though she told the ALJ that she sought medical treatment on January 7, 2018 after falling down some stairs when she became dizzy after rising from a chair. (R. 45). She also told Dr. Karri that she

becomes short of breath when she climbs stairs. (R. 518). The ALJ's only consideration of this issue was to state that it was "notable" that the hospital records showed "mild alcohol" when Claimant arrived at the ER on January 7, 2018. (R. 108; *see* R. 703, stating "appears mild ETOH" [ethyl alcohol]).

That failed to properly account for this line of evidence. Nothing in the medical notes suggests that Claimant fell *because* of "mild alcohol," and the ALJ had no ground for dismissing Claimant's fall on that basis without medical evidence to support her speculation. Claimant testified – and the ALJ overlooked – that she became dizzy three to four times a day. (R. 39). Indeed, the day after the fall, Claimant reported to her personal doctor that she was experiencing "room spinning dizziness when closing her eyes" and that she had fallen the previous day after "passing out." (R. 569). The doctor believed Claimant and stated in his record, "Neurological: positive for dizziness, syncope[.]" (R. 571). The ALJ failed to consider this evidence and must address Claimant's ability to use stairs more carefully on remand.

The ALJ must also account for Claimant's testimony about her difficulty in handling light. Claimant told the ALJ that she could not work in an office setting that used normal lighting because it triggers headaches for her. Claimant expressed her concern with this issue by wearing sunglasses to the administrative hearing as well as to Dr. Karri's medical exam on February 1, 2016 and to a physical exam in December 2017. (R. 13, 518). She also complained of light sensitivity to her doctors in 2015 and 2017. (R. 13, 417). The ALJ failed to account for any of this evidence and should revisit the issue on remand.

## CONCLUSION

For these reasons, Claimant's motion for summary judgment (Dckt. #15) is granted, and the Commissioner's motion for summary judgment (Dckt. #19) is denied. The decision of the Commissioner is reversed, and the case is remanded for further proceedings consistent with this Memorandum Opinion and Order. On remand, the ALJ shall restate her reasons for the symptom evaluation and for the RFC assessment on the terms set out in this Opinion.

**Dated: April 26, 2021**

_____
**Hon. Jeffrey Cummings
United States Magistrate Judge**